# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT GREENEVILLE

APRIL NICOLE BELL,          )
          Petitioner,      )
                       )   Nos.   2:12-CR-88
v.                     )            2:15-CV-193
                       )
UNITED STATES OF AMERICA,  )
          Respondent.    )

## MEMORANDUM OPINION AND ORDER

April Nicole Bell, ("petitioner" or "Bell"), a federal prisoner, has filed a "Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, Or Correct Sentence By A Person In Federal Custody," [Doc. 88][1], and an amended motion to vacate, [Doc. 97]  The United States has responded in opposition, [Docs. 92, 107], and petitioner has replied, [Doc. 114].  The matter is, therefore, ripe for disposition.  The Court has determined that the files and records in the case conclusively establish that Bell is not entitled to relief under § 2255 and no evidentiary hearing is necessary. For the reasons which follow, petitioner's motion will be DENIED and the case DISMISSED.

## I.      Procedural and Factual Background

Bell and co-defendant, Patrick Mullane Maxfield ("Maxfield"), were indicted by a federal grand jury on September 11, 2012, and charged in Count One with conspiring to produce child pornography in violation of 18 U.S.C. §§ 2251(a), and in Count Three with conspiracy to transport and distribute child pornography in violation of 18 U.S.C. § 2251(a).  Bell was charged in Count Two with producing child pornography in violation of 18 U.S.C. § 2251(a) and in Count Four with transportion and distribution of child pornography in violation of 18 U.S.C. §§

---

[1]  All references are to docket entries in No. 2:12-CR-88.

2252A(a)(1) and (a)(2). Bell was not charged in Count Five of the indictment.

After being arrested in the District of Colorado, Bell made her initial appearance in this district on November 8, 2012. [Doc. 7]. Counsel was appointed to represent her, [Doc. 7, 20]. A negotiated plea agreement was filed with the Court on March 12, 2013, [Doc. 34]. Pursuant to the plea agreement, petitioner pled guilty on March 27 to Count Four, the knowing transportation and distribution of child pornography. [Doc. 43]. The government agreed to dismiss the other charges. The plea agreement also contained a waiver of petitioner's right to file a direct appeal as long as her sentence was within "the sentencing guideline range or any applicable mandatory minimum sentence (whichever is greater) as determined by the district court," and her right to collaterally attack her conviction or sentence, except for claims of ineffective assistance of counsel or prosecutorial misconduct. [*Id*. at ¶ 10].

The Court ordered a presentence investigation report ("PSR") and scheduled a sentencing hearing for August 26, 2013. Petitioner faced a statutory mandatory minimum of five years of imprisonment to a maximum term of 20 years. The PSR established her guideline range for imprisonment at 97 to 121 months, [PSR, ¶¶ 79, 83], and a range of five years to life on supervised release. [*Id*. at ¶ 92]. At sentencing on September 9, 2013, the Court adopted the PSR, varied upward, and sentenced petitioner to a 188-month term of imprisonment, imposed a lifetime term of supervised release, ordered restitution in the amount of $6,910.00, and imposed a $100.00 mandatory assessment. Among other conditions of supervised release, the Court ordered that petitioner have no contact with her co-defendant, Maxfield. [Doc. 62]. Judgment was entered on September 13, 2013, [*Id*.].

Bell filed a notice of appeal on September 15, 2013, [Doc. 63]. The Sixth Circuit granted the government's motion to dismiss the appeal on the basis of the appellate-waiver provisions of

petitioner's plea agreement on April 23, 2014, but also found that "the district court neither abused its discretion nor committed plain error in imposing the [no-contact] condition because the condition addresses a valid concern regarding the safety and welfare of Bell."[2] Petitioner did not seek a writ of certiorari to the United States Supreme Court.. The instant § 2255 motion was then timely filed on August 18, 2014, and the amended § 2255 motion on July 17, 2015, the same day as Maxfield filed a § 2255 motion, [see Doc. 100].

Bell's plea agreement contained the following stipulated statement of facts:

> a)  The defendant met co-defendant Patrick Maxfield in November 2008 via an online internet chatroom.  At that time, the defendant resided in Johnson County, Tennessee and Maxfield resided in El Paso County, Colorado.  This relationship continued until the defendant and Maxfield were arrested on the instant charges in September 2012.

> b)  The relationship between defendant and Bell progressed and the defendant traveled from the Eastern District of Tennessee to Maxfield's home at 1145 Modell Drive, Colorado Springs, in El Paso County, Colorado.  The defendant and Maxfield became intimate.  The defendant and Maxfield periodically met at Maxfield's home.  When they were not physically together, the defendant and Maxfield communicated with each other on a regular basis via telephones, electronic mail, text messaging, instant messaging, and other means of electronic communications.  The parties agree that these communications traveled in interstate commerce from the Eastern District of Tennessee to the District of Colorado and vice-versa.

> c)  At all relevant times, the defendant operated a personal computer from her home in the Eastern District of Tennessee, with access to the internet provided by Sprint, an internet service provider.

> d)  From on or about August 1, 2009 to on or about October 31, 2009, the defendant downloaded seven images of child pornography onto her personal computer located at 394 Old Butler Road, Apartment B, Mountain City, Johnson County, in the Eastern District of Tennessee.  The defendant provided the seven

---

[2]  Maxfield, who had also appealed, and Bell had opposed the government's motion to dismiss, asserting that the special condition of supervised release permitting contact with each other violated their constitutional right to marry.

images of child pornography to Maxfield by remotely accessing Maxfield's computer and storing these images on Maxfield's computer. At the time she transmitted these images to Maxfield's computer, the defendant knew that the seven images would be transported from the Eastern District of Tennessee to Colorado.

e) The parties agree that between August 1, 2009 and February 1, 2011, Maxfield received the seven images of child pornography sent from the defendant's computer. The parties agree that the defendant knew Maxfield received the seven images of child pornography on his computer contemporaneously with these events.

f) The parties agree that defendant knowingly transported and distributed seven images of child pornography to Maxfield between August 1, 2009 and February 1, 2011 via the internet, which is a means of interstate commerce.

g) The parties agree that the seven distributed images depict an actual minor engaged in sexually explicit conduct as defined in 18 U.S.C. § 2256(2)(A)(v) to include the lascivious exhibition of the genitals or pubic area of a minor.

h) The defendant admits that at the time she distributed the seven images of child pornography, she was aware of their sexually explicit nature and character and she was aware that they depict an actual minor engaged in sexually explicit conduct, including the lascivious exhibition of the genitals or pubic area of a minor.

i) The parties agree that the defendant transported the seven images of child pornography transported in interstate commerce from the Eastern District of Tennessee to the District of Colorado.

[Doc. 34, ¶¶ 4(a) – 4(i)]. The PSR contained the following unobjected to statement of additional

facts:

The investigation in this case began in February of 2011, when a hospital health care worker in Colorado Springs, Colorado, reported that the defendant appeared to be a victim of violent domestic abuse. The El Paso County, Colorado, Sheriff's Office interviewed the defendant, who admitted that the numerous bruises, lacerations, and injuries she received had been inflicted by

4

her boyfriend and co-defendant, Patrick Maxfield.

Defendant Bell reported that she was a resident of Johnson County, Tennessee, who had met Maxfield via an adult online chat room in late 2008/early 2009. The relationship eventually became sexual, after Maxfield financed Bell's trip to Colorado Springs, Colorado. For approximately two years (2009-2011), the defendant periodically flew from east Tennessee to Colorado Springs, where she cohabitated with Maxfield for 10 to 14 days each time. They engaged in consensual sexual intercourse during these visits.

During 2010, it appeared the relationship evolved into the classical battered wife syndrome. Maxfield found fault with the defendant's behavior, beat her, she apologized and accepted punishment from him in the form of more beatings and written "improvement contracts." Maxfield allegedly beat the defendant with a 2-inch wooden dowel, an aluminum baseball bat, a crowbar, and a fire extinguisher. He kept separate sets of work gloves in his apartment, labeled for different types of beatings he inflicted on the defendant (for example, this is for the bitch when she doesn't do her chores). Maxfield left written notes to the defendant, and the defendant signed other written notes as, "MWPS," which is an acronym for "Most Worthless Piece of Shit."

The defendant is the mother of [AB], whose date of birth is ___ __, 2004. The defendant left [AB] in the custody of her parents when she visited Maxfield in Colorado.

Based on Bell's interview, the El Paso County Sheriff's Office obtained a state court search warrant to search Maxfield's apartment in Colorado Springs for the instruments of domestic violence. They executed the first search warrant on February 7, 2011, and during the course of the search, they found the first of multiple "contracts" between Bell and Maxfield which were suggestive of extreme violence. The Sheriff's Office obtained a second search warrant for indicia of ownership, indicia of occupancy, indicia of abuse, documents bearing evidence of physiological or physical abuse, which was executed on February 7, 2011. During the course of the second search warrant, the officers found inter alia, a copy of the birth certificate and identification card for [AB] and a deeply disturbing document in a file cabinet, in a folder labeled "April Bell." The document provided as follows.

> "Dear Diary, I, April Bell, am hereby
> agreeing to repay Patrick for the full amount of an

5

airline ticket for [my daughter, AB] to fly out to Colorado Springs to visit. The purpose of this visit is so Patrick can f—k her little girl p---y and cum her vagina. I also give Patrick full permission to Patrick to cum in her mouth while [AB] is sucking Pat's big c--k. This visit in December 2009 is intended solely for the purpose of Patrick getting his jollies off with [AB]. Patrick has full permission to bend [AB] over and F--k her doggystyle, and to bounce [AB] off his c--k! I give permission for Patrick to urinate in [AB's] vagina, and insert various objects into her ass and vagina - penetrating her and getting [AB] off. I further agree to hold Patrick and/or [AB] up in case either lose consciousness or pass out from too much excitement. Patrick is hereby Released from all Liability. Patrick is not responsible for any loss or damages to [AB] that may result from any of the above listed actions. The above list is not all inclusive, and other things can and will result – as long as the end results is Patrick cuming all over/or in [AB].

The document was dated October 23, 2009, and signed with the defendant's signature and printed name, along with the title "Parent of [AB]." Graphic stick figures are included as well as sexual connotations for the figures. After finding this document, the officers suspended their search and obtained and executed a third search warrant. Items seized included the defendant's computer, which was provided to Detective Mark Pfoff for forensic examination.

On February 7, 2011, the El Paso County Sheriff's Office interviewed the defendant and Maxfield at the police station. Maxfield admitted that he had corresponded with [AB] via telephone and computer, but had never personally met the child. He admitted that he and Bell had discussed April transporting [AB] to Colorado Springs for a visit with him. His interview terminated when he requested an attorney.

On February 8, 2011, the officers interviewed the defendant. She stated that Maxfield forced her to write the document about [AB], admitted it was her handwriting and signature, and admitted that Maxfield "kind of controlled me." The defendant stated that Maxfield expected her to fly [AB] out to Colorado to meet him, but she had no intention of allowing her to visit with him.

Defendant Bell otherwise denied the symptoms of battered wife syndrome and apologized for Maxfield's behavior.

On February 18, 2011, Detective Pfoff completed a pre-review of Maxfield's computer and located images of what appeared to be child pornography. He then suspended his examination and obtained a fourth search warrant to conduct a complete examination of Maxfield's computer and storage media. That search yielded seven images of what was later identified as [AB], age approximately 5 years old, in the lascivious exhibition of the genitals or pubic areas. The seven images were labeled "slut one, two, ..." and found in a computer folder labeled "[AB], the one and only." The images depict [AB] in various stages of nudity, and in provocative poses focusing on her vagina and her anus. Most of the images incorporate symbols of sexuality (poses) along with symbols of young childhood (pigtails, stuffed animals).

On March 2, 2011, [AB] was interviewed by Stephanie Furches, a Forensic Interviewer with the Johnson County, Tennessee Children's Advocacy Center in Mountain City, Tennessee. [AB] refused to discuss the photographs, but stated that she "knows Patrick Maxfield and has engaged in conversations with him via the computer with her mother present."

On March 9, 2011, the El Paso County Sheriff's Office conducted another interview of the defendant, during which she admitted that she made the seven images of her daughter between August 2009 and October 2009, while residing in Tennessee. The defendant stated she downloaded the images from a digital camera to her computer in Tennessee and then remotely accessed the defendant's computer and downloaded those seven images of [AB] on Maxfield's computer. Defendant Bell also admitted that Maxfield sent gifts to [AB] during this same time frame in 2009 via the United States mail (which had been confirmed during the search warrants). There is no evidence that Maxfield has ever physically contacted [AB], who has not traveled to Colorado Springs.

The El Paso County Sheriff's Office and District Attorney charged Maxfield with domestic violence against April Bell and with possession of child sexual exploitation images. Maxfield was released on bond pending his trial. When the defendant failed to obey a subpoena issued to her to appear for the preliminary hearing, the Colorado judge issued a warrant for her arrest. She remained in a fugitive status until early August 2012, when she was arrested.

7

[PSR, ¶¶ 16 – 29]

## II. Standard of Review

This Court must vacate and set aside petitioner's sentence if it finds that "the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, . . ." 28 U.S.C. § 2255. Under Rule 4 of the Governing Rules, the Court is to consider initially whether the face of the motion itself, together with the annexed exhibits and prior proceedings in the case, reveal the movant is not entitled to relief. If it plainly appears the movant is not entitled to relief, the court may summarily dismiss the § 2255 motion under Rule 4.

When a defendant files a § 2255 motion, he must set forth facts which entitle him to relief. *Green v. Wingo*, 454 F.2d 52, 53 (6th Cir. 1972); *O'Malley v. United States,* 285 F.2d 733, 735 (6th Cir. 1961). "Conclusions, not substantiated by allegations of fact with some probability of verity, are not sufficient to warrant a hearing." *O'Malley*, 285 F.2d at 735 (citations omitted). A motion that merely states general conclusions of law without substantiating allegations with facts is without legal merit. *Loum v. Underwood*, 262 F.2d 866, 867 (6th Cir. 1959); *United States v. Johnson*, 940 F. Supp. 167, 171 (W.D. Tenn. 1996).

To warrant relief under 28 U.S.C. § 2255 because of constitutional error, the error must be one of constitutional magnitude which had a substantial and injurious effect or influence on the proceedings. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citation omitted) (§ 2254 case); *Clemmons v. Sowders*, 34 F. 3d 352, 354 (6th Cir. 1994). *See also United States v. Cappas*, 29 F.3d 1187, 1193 (7th Cir. 1994) (applying *Brecht* to a § 2255 motion). If the sentencing court lacked jurisdiction, then the conviction is void and must be set aside. *Williams v. United States*,

582 F. 2d 1039, 1041 (6th Cir.), *cert. denied*, 439 U.S. 988 (1978). To warrant relief for a non-constitutional error, petitioner must show a fundamental defect in the proceeding that resulted in a complete miscarriage of justice or an egregious error inconsistent with the rudimentary demands of fair procedure. *Reed v. Farley*, 512 U.S. 339, 354 (1994); *Grant v. United States*, 72 F. 3d 503, 506 (6th Cir.), *cert. denied*, 517 U.S. 1200 (1996). In order to obtain collateral relief under § 2255, a petitioner must clear a significantly higher hurdle than would exist on direct appeal. *United States v. Frady*, 456 U.S. 152 (1982).

A petitioner alleging ineffective assistance of counsel must satisfy a two-part test. *Strickland v. Washington*, 466 U.S. 668, 687 (1987). *See also*, *Huff v. United States*, 734 F.3d 600, 606 (6th Cir. 2013). First, the Petitioner must establish, by identifying specific acts or omissions, that counsel's performance w*a*s deficient and that counsel did not provide "reasonably effective assistance," as measured by "prevailing professional norms." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005). Counsel is presumed to have provided effective assistance, and the Petitioner bears the burden of showing otherwise. *Mason v. Mitchell*, 320 F.3d 604, 616-17 (6th Cir. 2003); *see also Strickland*, 466 U.S. at 689 (a reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that . . . the challenged action might be considered sound trial strategy") (internal citation omitted).

Second, the Petitioner must demonstrate "a reasonable probability that, but for [counsel's acts or omissions], the result of the proceedings would have been different." *Strickland*, 466 U.S. at 694. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691; *see also Smith v. Robbins*, 528 U.S. 259, 285-86 (2000). The Court is not required to

analyze both prongs of the *Strickland* test as to every claim. *Strickland*, 466 U.S. at 697. Indeed, the Supreme Court recommended that, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Id.*; accord *United States v. Hynes*, 467 F.3d 951, 970 (6th Cir. 2006).

## III.    Analysis

### A.    The Original § 2255 Motion

Although Bell indicated in her motion for leave to file an amended motion that "all grounds in her original § 2255 motion be replaced with her new Application and Brief," [Doc. 95, at 1], it is not at all clear to the Court that she intended to abandon the claims set forth in her August 18, 2014 filing. Thus, the Court will briefly address each of the issues raised in that motion.

#### 1.    Violation of Rule 32

Petitioner pled guilty to an offense for which the statutory range of punishment was a mandatory minimum of five years to a maximum of 20 years of imprisonment. As set forth above, petitioner's advisory guideline range was 97–121 months' imprisonment. Prior to sentencing, the government filed a sentencing memorandum and motion for variance asking the Court to vary upward to a guideline range of 121-151 months and to impose a sentence at the high end of that range. At sentencing, the Court varied upward further than the government requested and imposed a sentence of 188 months.

Bell claims the Court violated Rule 32(h) of the Federal Rules of Criminal Procedure which requires that the Court give notice to the parties "that it is contemplating" a departure "from the applicable sentencing range on a ground not identified for departure either in the presentence report or in a party's prehearing submission." Fed. R. Crim. P. § 32(h). She

asserts that the failure of the Court to do so made "it impossible to argue against it, and/or withdraw my plea." [Doc. 88, at 5].

This claim fails for several reasons. First of all, the claim falls squarely within the scope of the § 2255 waiver provision in petitioner's plea agreement. The plea agreement contains the following language: "the defendant knowingly and voluntarily waives the right to file any motions or pleadings pursuant to 28 U.S.C. § 2255 or to collaterally attack the defendant's conviction and/or resulting sentence." [Doc. 34, ¶ 10(b)]. The petitioner only reserved the right "to raise, by way of collateral review under § 2255, claims of ineffective assistance of counsel or prosecutorial misconduct not known to the defendant by the time of the entry of judgment." [*Id*.]. This claim does not fall within the limited exception and petitioner's waiver prevents her from bringing a collateral attack on this issue. *See Davila v. United States*, 258 F.3d 448, 451 (6th Cir. 2001) (criminal defendant may waive any statutory or constitutional right in a plea agreement, so long as it is knowing and voluntary); *Watson v. United States*, 165 F.3d 486, 489 (6th Cir. 1999) (holding, in case with waiver provision almost identical to the one in petitioner's plea agreement, that defendant waived the issue and it was not necessary to address the merits of the issues raised); *Clark v. United States*, 2006 WL 351148, at * 5 (E.D. Tenn. Dec. 1, 2006) ("a waiver in a plea agreement not to file any motion or pleadings pursuant to 28 U.S.C. § 2255 is an effective means to bar such relief.").

Secondly, this claim has been procedurally defaulted since it was not raised on direct appeal. A petitioner who procedurally defaults a claim and raises it for the first time on collateral review must show either that (1) she had good cause for not raising it earlier <u>and</u> would suffer "actual prejudice" if it were not reviewed, or (2) she is actually innocent. *Bousley v. United States*, 523 U.S. 614, 621-22 (1998); *United States v. Frady*, 456 U.S. 152,

167-68 (1982); *Peveler v. United States*, 269 F.3d 693 (6th Cir. 2001). Petitioner makes no effort to excuse her procedural default and she may not circumvent her waiver of her right to a direct appeal by raising the claim on collateral review. *See United States v. Calderon*, 1999 WL 801587, at * 4 (6th Cir. Sept. 27, 1999).

Finally, the claim fails on the merits. The record is clear that the 188-month sentence imposed by the Court was an upward variance based on the factors listed in 18 U.S.C. § 3553(a), not an upward departure under the Guidelines, and, as such, Rule 32(h) was inapplicable. *Irizarry v. United States*, 553 U.S. 708, 715-16 (2008) (due process does not require advance notice of variances); *United States v. Denny*, 650 F.3d 415, 419-20 (6th Cir. 2001). In addition, even if the Court's sentence could somehow be interpreted as a Guidelines departure, Rule 32(h) requires advance notice only to the extent that the Court relies on grounds "not identified . . . in the presentence report or in a party's prehearing submission." Fed. R. Crim. P. 32(h) The grounds relied upon by the Court, [*see generally* Doc. 70, Tr. Of Sent.], were clearly raised either in the presentence report, [*see* PSR, ¶ 96] (identifying USSG §2G2.2, application note 7, as basis for an upward departure because petitioner engaged in the sexual abuse or exploitation of her minor daughter) or in the government's motion for upward variance, [Doc. 59] (also noting USSG § 2G2.2, application note 7, and evidence that petitioner "engag[ed] in correspondence and contact strongly suggesting she intended to provide her daughter to her boyfriend for sexual purposes," that she produced pornographic images of her minor daughter, that Bell "seems to express no remorse or shame for her behavior," that her offenses are "heinous," that "the commission of such offenses by a child's mother is beyond heinous and enters the realm of the unbelievable," that she "fled [Colorado] rather than testify against her boyfriend," and that she "has no respect for the law.") Even if Rule 32(h) applied,

12

therefore, the PSR and the government's prehearing submissions clearly put Bell and her attorney on the required notice.

## 2. Excessive Sentencing

In this claim, Bell compares her sentence to that of another defendant who pled guilty to the distribution of child pornography and was sentenced to 84 months imprisonment and placed on supervised release for ten years. Citing *United States v. McBride*, 511 F.3d 1293 (11th Cir. 2007), petitioner states that the defendant received a sentence well below the applicable guidelines range even though he had a history of lewd acts against minors and had 981 images and 45 videos of child pornography. Bell, on the other hand, says she has no criminal history and no history of crimes against children. She claims her sentence is unjust when compared to *McBride*'s.

This claim, like the previous one, is procedurally defaulted. It too, however, fails on the merits. In order to prevail upon a § 2255 motion, the movant must allege as a basis for relief "(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." *Weinberger v. United States*, 268 F.3d 346, 351 (6th Cir. 2001). "[M]istakes in the application of the sentencing guidelines" are non-constitutional errors and non-constitutional errors are not cognizable on collateral review. *Grant v. United States*, 72 F.3d 503, 506 (6th Cir. 1996). Petitioner alleges no constitutional error at sentencing, nor does she contend that her sentence exceeded the statutory limits.

To the extent petitioner argues that the Court failed to consider a possible disparity between her sentence and that of another individual defendant, McBride, the government correctly argues that the Court need not, but may, consider such arguments at

sentencing. Section 3553(e) is "not concerned with disparities between one individual's sentence and another individual's sentence, *United States v. Simmons*, 510 F.3d 620, 623 (6th Cir. 2007), but rather with "national disparities." *United States v. Mikowski*, 332 Fed. App'x 250, 255 (6th Cir. 2009). Finally, even if the argument had been made at sentencing, it would not have changed the sentence imposed by the Court in Bell's case.

### 3. Ineffective Assistance of Counsel[3]

According to Bell, her "appointed attorney failed to represent and work for [her] to obtain the best outcome." [Doc. 88, at 10]. She appears to fault counsel for not "talk[ing] to the prosecution and get a better deal." [*Id.*] More specifically, she says counsel did not do "relevant research" to find cases like *McBride*, failed to argue that her sentence was unreasonable, failed to answer correspondence since April, 2014, and failed to negotiate a Rule 11(c)(1)(C) plea agreement.[4] These allegations do not satisfy the *Strickland* standard.

First, Bell's argument overlooks the fact that there is "no constitutional right to a plea agreement." *Weatherford v. Bursey*, 429 U.S. 545, 561 (1997). Furthermore, as the government argues, neither petitioner nor her attorney could compel the government to agree to an 11(c)(1)(C) plea agreement, which would also have been subject to court approval, or any other kind of more favorable plea agreement. Petitioner's argument relating to *United States v. McBride* fails for the reasons set forth in the preceding section and she identifies no other "relevant research" which could have been done by her lawyer. As for petitioner's argument that counsel failed to argue that her sentence was unreasonable, that claim is contradicted by the

---

[3] Petitioner raises a fourth claim in her original motion related to the Court's imposition of a no-contact with Maxfield condition of supervised release. Since she restates that claim in her amended petition, the Court will not address it in this part of the memorandum.

[4] Bell also claims that the plea agreement she accepted resulted in a sentence no "different than the guidelines for the sentence if taken to trial." This claim is frivolous on its face since Bell received a three-level reduction which she would have lost if she had taken the case to trial. In addition, if she had been convicted at trial of all counts in the indictment she likely would have faced a much longer term of imprisonment.

14

transcript of the sentencing hearing, [Doc. 70, at 18-23], and the sentencing memorandum filed by counsel. [Doc. 58]. Finally, Bell's argument that counsel has not responded to her correspondence since April, 2014, about six months after entry of the Court's judgment, does not state a cognizable § 2255 claim. As the government correctly points out, criminal defendants have no constitutional right to the assistance of counsel with regard to any discretionary appellate review or collateral review. *See Nichols v. United States*, 563 F.3d 240, 248 (6th Cir. 2009) (*en banc*). In addition, Bell does not state the nature of the correspondence or address in any way how she might have been prejudiced by counsel's failure to answer her letters.

**B.     Amended Section 2255 Motion, [Doc. 97]**

Although somewhat difficult to follow, petitioner states her grounds for relief in the memorandum in support of her amended petition as follows:

1).     Ineffective Assistance of Counsel- Petitioner's plea of Guilty was not knowing and voluntary.

2).     Ineffective Assistance of Counsel -Counsel failed to argue at sentencing that the Supervised Release Condition of a No-Contact Order with her common-law spouse was both unconstitutional and illegal.

3).     Ineffective Assistance of Counsel -Counsel failed to object to the Court's violation of Rule 32 Fed.R.Crim.P. when the Court sentenced Petitioner above the Guidelines as set forth in the P.S.R. without prior notice.

4).     Sentence is illegal in that it contains an unconstitutional no-contact order as a special condition of Supervised Release. Neither trial or Appellate counsel argued that appeal waiver is not meant to allow for a subsequent illegal sentence.

[Doc. 98, pp. 3-4]

In one way or another, all of petitioner's claims, except the one raised as ground 3, revolve around a single argument, i.e. that the Court lacked constitutional and/or statutory

authority to impose the special condition of supervised release that she have no-contact with her co-defendant and alleged common-law husband, Patrick Maxfield.[5]  But the underlying argument lacks merit and the Court will address that issue first.

Under 18 U.S.C. § 3583(d), the Court may order a special condition of supervised release if it "(1) is reasonably related to the factors set forth in [18 U.S.C. §] 3553(a)(1), (a)(2)(B), (a)(2)(C), and (a)(2)(D); (2) involves no greater deprivation of liberty than is reasonably necessary for the purposes set forth in [18 U.S.C. §] 3553(a)(2)(B), (a)(2)(C), and (a)(2)(D); and (3) is consistent with any pertinent policy statements issued by the Sentencing Commission pursuant to 28 U.S.C. 994(a)."  18 U.S.C. § 3583(d).  If a condition of supervised release is "reasonably related to the dual goals of . . . rehabilitation of the defendant and the protection of the public," it will be reversed on appeal "only in comparatively extreme circumstances." *United States v. Kingsley*, 241 F.3d 828, 835 (6th Cir. 2001) (quoting *United States v. Ritter*, 118 F.3d 502, 504 (6th Cir. 1997)).

While it is not at all clear from the record that petitioner and Bell are legally married at common-law,[6] Colorado does recognize such unions, *see In re Marriage of Cargill*, 843 P.2d

---

[5]  Bell does not now, nor did she at the time of sentencing, object to the "standard" condition of supervised release that she "shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer."  [Doc. 62, at 3].  Maxfield, her co-defendant, is clearly a convicted felon and the conditions would prohibit contact with him unless Bell sought permission from the probation officer or the Court to have such contact.  Even now, the Court retains the authority to modify the conditions of supervised release if circumstances warrant modification.  See 18 U.S.C. § 3583(e)(2).

[6]  As noted above, Bell flew to Colorado "periodically" where she cohabited with Maxfield for 10 to 14 days each time.  In Colorado, the requirements for common-law marriage are stated as follows:

> A common law marriage is established by mutual consent or agreement of the parties to be husband and wife, followed by a mutual and open assumption of a marital relationship.  *People v. Lucero*, 747 F.2d 660 (Colo. 1987).  Absent an express agreement, the two factors considered the most reliable in determining whether an intent to be married has been established are cohabitation and a general reputation in the community that the parties hold themselves out as husband and wife.  *Whitehall v. Kiser Permanente*, 940 P.2d 1129, 1132 (Colo. App. 1997).

[Doc. 101-2, at 1].  Although Bell and Maxfield have asserted in their pleadings that they are married at common-law,

16

1335 (Colo. 1993), and the Court will assume a proper and legal marriage for the purpose of deciding this § 2255 motion. Marriage is a constitutionally protected relationship, *Obergefell v. Hodges*, --- U.S. ---, 135 S. Ct. 2584, 2599 (2015) (citing *Loring v. Virginia*, 388 U. S. 1 (1967) and other cases), but those convicted of crimes lose a measure of their liberties. *See Griffin v. Wisconsin*, 483 U. S. 868, 874 (1987). "Thus, special conditions that restrict constitutional rights are upheld so long as they (1) are directly related to deterring the defendant and protecting the public and (2) are narrowly tailored." *United States v. Crandon*, 173 F.3d 122, 128 (3d Cir. 1999). *See also United States v. Smelcer*, 464 Fed. App'x 469 (6th Cir. 2012) (district court's order that, as a condition of supervised release, defendant not have any contact with wife or children without court order, was justified).

The no-contact order in this case was fully justified. Even though the Court did not fully set out the reasons on the record at sentencing because there was no objection raised, the record is replete with the reasons for the restriction. The no-contact order is clearly reasonably related to deterring Maxfield and to protecting the public, including Bell and her minor daughter, the victim in this case. As set forth above, Bell, who lived in Johnson County, Tennessee made pornographic images of her five-year-old daughter and provided the images to Maxfield in Colorado by remotely accessing Maxfield's computer and storing the images on the computer. After Bell was interviewed at a hospital in Colorado Springs where she was admitted with "numerous bruises, lacerations, and injuries" inflicted by Maxfield, a search warrant was obtained to search Maxfield's apartment in Colorado Springs for the instruments of domestic violence.

---

their pleadings are not supported by any affidavit or other information from which the Court could necessarily conclude that an intent to marry has been established. The only information provided, despite their assertion of an intimate relationship of seven years, is that over a two-year period, Maxfield and Bell cohabited "periodically" for 10 to 14 days each time. Nothing is found in the record to support any open assumption of a marital relationship and communication to the public of their marital status nor a general reputation in the community that the parties have held themselves out as husband and wife.

Bell's and Maxfield's relationship was apparently "the classic battered wife syndrome." According to Bell, when Maxfield found fault with her behavior, he beat her and they entered into written "improvement contracts." Maxfield allegedly beat Bell with a 2 inch wooden dowel, an aluminum baseball bat, a crowbar, and a fire extinguisher. Maxfield "kept separate sets of work gloves" which were "labeled for different types of beatings he inflicted on Bell (for example, this is for the bitch when she doesn't do her chores)." During the first search on February 7, 2011, officers found the first of multiple "contracts." The sheriff's office obtained and executed a second search warrant.

During the course of the second search, officers found a copy of Bell's minor daughter's birth certificate and identification card and a file folder labeled "April Bell." Inside the folder was a document, dated October 23, 2009, which read as follows:

> Dear Diary, I, April Bell, am hereby agreeing to repay Patrick for the full amount of an airline ticket for [my daughter, AB] to fly out to Colorado Springs to visit. The purpose of this visit is so Patrick can f---k her little girl p---y and cum her vagina. I also give Patrick full permission to Patrick to cum in her mouth while [AB] is sucking Pat's big c - - k. This visit in December, 2009 is intended solely for the purpose of Patrick getting his jollies off with [AB]. Patrick has full permission to bend [AB] over and F--k her doggiestyle, and to bounce [AB] off his c--k! I give permission for Patrick to urinate in [AB's] vagina, and insert various objects into her ass and vagina – penetrating her and getting [AB] off. I further agree to hold Patrick and/or [AB] up in case either lose consciousness or pass out from too much excitement. Patrick is hereby Released from all Liability. Patrick is not responsible for any loss or damages to [AB] that may result from any of the above listed actions. The above list is not all inclusive, and other things can and will result – as long as the end results is Patrick cuming all over/or in [AB].

[PSR, ¶ 21]. The document, signed by Bell as "Parent of [AB]," included graphic figures with sexual connotations.

After this document was found, a third search warrant was obtained and Maxfield's computer was seized. A forensic examination of the computer yielded seven images of Bell's five-year-old daughter in the lascivious exhibition of the genitals or pubic area. The images were labeled "Slut 1, 2 . . ." and found in a folder labeled "[child's name], the one and only." In a February 7, 2009 interview, Maxfield admitted that he had corresponded with the child by telephone and computer but had never personally met the child. He admitted he and Bell had discussed transporting the child to Colorado Springs to visit with Maxfield. During an interview with Bell, she told Colorado officers that Maxfield had forced her to write the October 29 document and that "he kind of controlled [her]."[7] She said she and Maxfield had discussed having the child fly out to Colorado but that she had no intention of doing so. She also stated that Maxfield had sent gifts to the child in Tennessee.

In May, 2013, Maxfield sent a letter to Bell's attorney, requesting that he deliver it to Bell. The letter expressed Maxfield's love for Bell's minor daughter. The letter stated [to Bell]: "I miss pulling your hair so much but I promise to yank the hell out of it when we are done with all this hell." [Maxfield PSR, ¶ 33].

Maxfield's relationship with Bell was apparently not his only involvement with exploitation of females or sexual exploitation of a minor. In 1999, Maxfield was charged with three counts of sexual exploitation of a child. Although the charges were ultimately dismissed, further evidence of the petitioner's controlling personality and behavior is found in the circumstances surrounding those charges. Maxfield, 21-years old at the time, was accused of

---

[7] Maxfield's efforts to control Bell appear to have continued despite the no-contact condition of supervised release. Bell also filed a § 2255 motion. Her original motion, filed on August 14, 2014, raised three claims: (1) violation of Rule 32 relating to notice of the Court's intent to depart upward, (2) excessive sentence and (3) ineffective assistance of counsel (unrelated to the no-contact special condition of supervised release). On the same day Maxfield filed his § 2255 motion, Bell filed a motion for leave to amend her § 2255 motion in which she raises the very same claims raised by Maxfield. Her supporting memorandum and affidavit are virtually identical to that filed by Maxfield and they were clearly drafted by the same person.

sexual exploitation and harassment of two underage females. Sexual conduct involving Maxfield and the two was videotaped and Maxfield admitted to the relationships but claimed they were consensual. During the course of that investigation, a handwritten list Maxfield provided to one of the victims surfaced. The list contained numerous "directions" from Maxfield to the victim on how to handle the situation with her father and gain his acceptance. Of significance, Maxfield threatened and verbally abused the victim, telling her at one time that he would "cut her up and send her to her father in pieces." Records from individual psychotherapy sessions between 1996 and 1999 and again in 2002 showed a primary diagnosis for Maxfield of "Schizotypal Personality Disorder" with the following: "behaviors and appearance that were odd, eccentric, and peculiar; odd beliefs and/or magical thinking that influences his behaviors; obsessive ruminations, often with sexual or aggressive contents; vague, circumstantial, metaphorical, overelaborate or stereotyped thinking, manifested by odd speech patterns and incoherent rambling; and transient quasi- psychotic episodes with intense illusions, auditory or other hallucinations and delusions." [PSR, ¶ 75].

The no-contact order was thus reasonably related to a number of the 3553(a) factors, including the protection of the public and, as the Sixth Circuit observed, Bell's own safety and welfare. Maxfield has exhibited threatening, assaultive and controlling behavior towards Bell and others; he and Bell conspired in the production of pornographic videos of Bell's child; and it is apparent that Maxfield was "grooming"[8] Bell's minor child for illegal sexual contact. The condition is clearly necessary to protect Bell herself, her child, and other minors from threats and

---

[8]  "Grooming is the process during which a child sexual offender draws a child in by gaining his or her trust in order to sexually abuse the child and maintain secrecy." The stages of grooming may include an offender watching and getting to know his victims and their needs, filling the child's needs with gifts, affection, or attention so that they take on a more important role in the child's life, and use of threats and guilt to enforce secrecy and the child's continued participation and silence. www.mcasa.org/_mcasaWeb/wp-content/uploads/2012/03/Behaviors -of-Sexual-Preditors-Grooming.pdf, last visited Nov. 7, 2016. In this particular case, it appears that Maxfield was both grooming the minor child and attempting to manipulate and control her mother for the purpose of his deviant sexual gratification.

assaults at the hands of Maxfield. It is just as clear that Bell, who had no prior criminal history, is easily manipulated by Maxfield and thus needing of protection from him.

The facts above resolve, in large part, the claims advanced by petitioner. The Court will address briefly, however, the specific claims of ineffective assistance of counsel raised by petitioner in his motion.

Petitioner alleges that, had she been informed by counsel of the possibility of a no-contact with Maxfield condition of supervised release, she "would have asked that the right to appeal on that issue be preserved or otherwise, gone to trial." [Doc. 97, at 4]. In her memorandum, she claims that she might also have entered an open plea. As a result, she claims her guilty plea and the waiver of her appellate rights were not knowing and voluntary. Bell makes it clear that she does not challenge her guilt, only the no-contact term of supervised release. With this claim, petitioner appears to argue that both counsel and the Court had an obligation to inform her, before her guilty plea, that the Court could impose the no-contact condition.

A guilty plea, entered by a defendant who is "fully aware of the direct consequences, including the value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats, misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes)." *Mabry v. Johnson*, 467 U.S. 504, 509 (1973). A defendant "need only be aware of the direct consequences of the plea, however; the trial court is under no obligation to inform the defendant of all the possible collateral consequences of the plea." *King v. Dutton*, 17 F.3d 151, 153 (6th Cir. 1994). The Sixth Circuit has stated that "the distinction between a direct and collateral consequence turns on whether the result flowing from the plea is definite, immediate, and automatic." *Id.* at 154 (and cases cited

therein). A consequence is "direct" where it presents "a definite, immediate and largely automatic effect on the defendant's range of punishment," *United States v. Wills*, 881 F.2d 823, 825 (9th Cir. 1989), but the consequence is "collateral" where it lies within the discretion of the court to impose it. *Id.*; *see also United States v. Kikuyama*, 109 F.3d 536, 537 (9th Cir. 1997).

Neither the Court nor counsel was required to inform petitioner of this collateral consequence of her guilty plea. The consequences of the supervised release condition to which Bell now objects were not immediate nor automatic, i.e., a direct consequence. Because the Court had discretion to impose or reject the special condition requested by the government in this case, the Court's decision to impose the no-contact condition is a "collateral" consequence of the plea. *See United States v. Goddard*, 537 F.3d 1087, 1089 (9th Cir. 2008). *See also United States v. Daas*, 67 F.3d 300 (Table), 1995 WL 583384 at *2-*3 (6th Cir. Oct. 3, 1995). Nothing in Rule 11 or the Constitution requires the Court to advise the defendant of all possible collateral consequences of her guilty plea, *King*, 17 F.3d at 153, and it is well settled that where a court scrupulously follows the requirements of Federal Rule of Criminal Procedure 11 "the defendant is bound by his statements in response to that court's inquiry." *Baker v. United States*, 781 F.2d 85, 90 (6th Cir. 1986) (quoting *Moore v. Estelle*, 526 F.2d 690, 696-97 (5th Cir. 1976)). The record establishes that this Court painstakingly followed the Rule 11 requirements and, as found at the change of plea hearing, the petitioner's plea of guilty was knowing and voluntary. Her under oath answers to the Court's questions clearly established that the plea was knowledgeably and voluntarily made, as found by the Court at the time.

Counsel's failure to advise a defendant of the collateral consequences of his or her plea "is not objectively unreasonable and therefore does not amount to ineffective assistance," *United States v. Fry*, 322 F.3d 1198, 1200 (9th Cir. 2003) (citing *Torrey v. Estelle*, 842 F.2d 234, 237 (9th

Cir. 1988)), notwithstanding petitioner's reliance on *Padilla v. Kentucky*, --- U.S. ---, 130 S. Ct. 1473 (2010) in support of her argument that counsel should have advised her of the possibility of a no-contact condition of supervised release. *Padilla* does not go nearly as far as petitioner urges. In *Padilla*, the petitioner, an alien, claimed that counsel failed to advise him of the immigration consequences of his guilty plea, more specifically, the likelihood of removal as a result, something "nearly an automatic result for a broad class of non-citizen offenders." *Padilla*, 130 S. Ct. at 1481. Finding that "[t]he weight of prevailing professional norms supports the view that counsel must advise his client regarding the risk of deportation," *id*. at 1482, the Supreme Court held "that counsel must inform her client whether his plea carries a risk of deportation." *Id*. at 1486. *Padilla*'s holding was specifically limited, however, to the deportation context and has not been extended beyond that context by the Sixth Circuit or the Supreme Court since *Padilla* was decided. Indeed, petitioner points to no case which has extended the holding of *Padilla* in the manner argued by her and *Padilla* is "not importable–either entirely or, at the very least, not readily importable–in the scenarios involving collateral consequences other than deportation." *United States v. Parrino*, 2015 WL 4272022 at * 11 (W.D. Ky. July 13, 2015) (quoting *United States v. Suero*, 2014 WL 6896011 at * 6 n.2 (D.N.H. Dec. 5, 2014) (citing *Brown v. Goodwin*, No. 09-211 (D.N.J. May 11, 2010)). *See also Rodriguez-Murano v. Oregon*, 2011 WL 6980829 at * 4 (D. Ore. Nov. 15, 2011).

These claims relating to the voluntariness of petitioner's guilty plea fail for two additional and very obvious reasons. First, her argument is foreclosed by the Sixth Circuit's prior holding that the appellate waiver provision was valid, i.e., voluntarily made, and therefore fully enforceable and petitioner had every opportunity to argue before the Sixth Circuit that her plea agreement and subsequent guilty plea were not voluntary because she was not informed of the

possibility of the no-contact condition of supervision by counsel.  Second, petitioner's claim that, had she known of the possibility of the no-contact condition, she would have insisted on preserving the issue for appeal, would have entered an open plea, or gone to trial, are not credible. Petitioner cannot show any likelihood that she could have successfully "demanded" such a provision in her plea agreement, something it is apparent she could not have unilaterally achieved without the government's concurrence.[9]  Furthermore, if what Bell means by an "open" plea means that she would have pled guilty to the indictment without a plea agreement in order to preserve her right to appeal, such a position defies logic and common sense. Had she simply entered a plea of guilty to the indictment without a plea agreement, she would then have faced a mandatory minimum term of imprisonment on the production count alone of 15 years, and her advisory guideline range could have been even higher.  The same is true if she had taken her case to trial.

Petitioner also claims ineffective assistance of counsel in that she instructed/requested counsel to "argue against the no-contact Order," and, had counsel done so, "the Court would not have imposed an illegal sentence."[10]  Counsel, however, is not required to argue issues that lack merit, even in the face of a defendant's request/instruction that he do so.  *Fautenberry v. Mitchell*, 515 F.3d 614, 642 (6th Cir. 2008) ("effective assistance does not require counsel to raise every non-frivolous argument.").  But even if the Court assumes that counsel's conduct was somehow deficient, Maxfield can show no prejudice, i.e., that the Court would not have imposed the condition had counsel made the argument.  As set forth above, the no-contact order was neither

---

[9]   The Court also lacked the authority to modify Bell's plea agreement.  "Nothing in the rules even remotely allows the district court to accept a guilty plea but rewrite the plea agreement, even if the modified agreement is more favorable to the defendant." *United States v. Fleming*, 239 F.3d 761, 764-65 (6th Cir. 2001) (quoting *United States v. Skidmore*, 998 F.2d 372, 375 (6th Cir. 1993)).

[10]   Bell argues that counsel never discussed with her the possibility of a no-contact order.  She does not explain the apparent contradiction between that claim and her claim that she instructed counsel to argue against the no-contact order.

unconstitutional nor illegal and petitioner has suggested no argument counsel could have made which would have persuaded the Court not to impose the condition in order to protect Bell, her minor daughter, and the public at large.

## IV.     Conclusion

For the reasons set forth above, the Court holds that petitioner's conviction and sentencing were not in violation of the constitution or laws of the United States and her motion to vacate, set aside or correct her sentence pursuant to 28 U.S.C. § 2255 is DENIED.

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The Sixth Circuit Court of Appeals disapproves of the issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F. 3d 466 (6th Cir. 2001). The District Court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id*. at 467. Each issue must be considered under the standard set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473, 120 S. Ct. 1595 (2000). *Id.*

Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." After reviewing each of Petitioner's claims, the Court finds that reasonable jurists could not conclude that petitioner's claims are adequate to deserve further review. Because petitioner has failed to make a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue.

SO ORDERED:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE
